<div align="center">

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION AT CLEVELAND**

</div>

| | |
|---|---|
| AMY S. TANNER, individually and on behalf of all others similarly situated, 19522 Marwood Ave. Cleveland, OH 44135 | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| WELLS FARGO BANK, N.A., ℅ Corporation Service Company 50 West Broad Street, Suite 1330 Columbus, OH 43215 | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Amy S. Tanner, individually and on behalf of all others similarly situated, by and through counsel, brings this action against Defendant Wells Fargo Bank, N.A., and for her Class Action Complaint, states as follows:

<div align="center">

**PARTIES, JURISDICTION, AND VENUE**

</div>

1.      Plaintiff Amy S. Tanner ("Plaintiff" or "Tanner") is a natural person residing in Cuyahoga County, Ohio.

2.      Defendant Wells Fargo Bank, N.A. ("Defendant" or "Wells Fargo") is a federal depository institution incorporated under the laws of the State of Delaware, and, upon belief, maintains its principal place of business at 101 N. Phillips Ave., Sioux Falls, South Dakota 57104.

3.      Wells Fargo does business in the state of Ohio and is licensed to do business in the state of Ohio as a foreign corporation.

4.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiff's claims that arise under federal law, specifically the Real Estate Settlement Procedures Act ("RESPA")—codified as 12 U.S.C. §§ 2601, *et seq*. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims that arise under state law. This Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), as Plaintiff and Defendant have diversity of citizenship, Plaintiff brings this case as a class action, the proposed Class consists of 100 or more members, and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

5.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## FHA MORTGAGES AND REGULATIONS OF THE HUD SECRETARY

6.     Every residential mortgage loan that is insured by the Federal Housing Administration ("FHA"), including Plaintiff's loan with Wells Fargo, contains substantially similar contractual provisions requiring lenders to comply with the rules and regulations promulgated by the Secretary ("Secretary") of the United States Department of Housing and Urban Development ("HUD"). Specifically, those security instruments provide, with substantial uniformity, as follows:

> (a)     Default. Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:
>
> > (i)     Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

      (ii)     Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

<div align="center">* * *</div>

      (d)     Regulations of HUD Secretary. In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

*See*, copy of Plaintiff's FHA-insured mortgage loan ("Plaintiff's Mortgage"), attached as <u>Exhibit 1</u>.

7.     Pursuant to 12 U.S.C. § 1715u(a), the Secretary has the authority to promulgate regulations concerning the loss mitigation options available to borrowers in default on their FHA-insured mortgage obligations.  That statutory provision reads:

> Upon default or imminent default, as defined by the Secretary of any mortgage insured under this subchapter, mortgagees shall engage in loss mitigation actions for the purpose of providing an alternative to foreclosure (including but not limited to actions such as special forbearance, loan modification, preforeclosure sale, support for borrower housing counseling, subordinate lien resolution, borrower incentives, and deeds in lieu of foreclosure, as required, but not including assignment of mortgages to the Secretary under section 1710(a)(1)(A) of this title) or subsection (c), as provided in regulations by the Secretary.

12 U.S.C. § 1715u(a).

8.     The Secretary's rules and regulations relative to the servicing of FHA-insured mortgage loans for single family homes—such as Plaintiff's Mortgage—are set forth in the FHA's *Single Family Housing Policy Handbook 4000.1* ("SF Handbook").[1]

---

[1] Tthe SF Handbook is publicly available at: <u>https://www.allregs.com/tpl/</u>.

9.     The SF Handbook requires a mortgagee to ensure all mortgages insured by the FHA that are delinquent are serviced in accordance with FHA requirements and all applicable laws. SF Handbook 4000.1 at III.A.2.a.ii, Revision No. 032719, March 14, 2016.

10.     The Secretary and HUD limit mortgagees' rights in the case of payment defaults through their policies pertaining to loss mitigation as contained in the SF Handbook.

11.     In particular, the SF Handbook requires that mortgagees timely evaluate and respond to *all* loss mitigation requests from a borrower, as follows:

ii.  Complete Loss Mitigation Requests

(A) Definition

A Complete Loss Mitigation Request is a request for loss mitigation assistance that contains all information the Mortgagee requires from the Borrower in order to evaluate Loss Mitigation Options.

(B) Standard

The Mortgagee must timely evaluate and respond to Complete Loss Mitigation Requests. For loss mitigation requests received after the initiation of foreclosure, the Mortgagee must evaluate and respond to Complete Loss Mitigation Requests according to the time frame requirements in Loss Mitigation during the Foreclosure Process.

When a Mortgagee receives incomplete loss mitigation requests, the Mortgagee must notify the Borrower in writing:
● which documents are needed for review; and
● when the documents should be sent back to the Mortgagee.

This notice must include the required statement that the Borrower should consider contacting Mortgagees of any other Mortgages secured by the same Property to discuss available Loss Mitigation Options.

(C) Required Documentation

The Mortgagee must note in its servicing file:
- the dates it received a Complete Loss Mitigation Request;
- the dates it sent any notices to the Borrower requesting additional documentation, if applicable; and
- what documentation was requested, if applicable.

SF Handbook 4000.1 at III.A.2.i.ii, Revision No. 032719, March 27, 2019.[2]

12.     Notably, the SF Handbook does not place a limit on the number of loss mitigation requests a mortgagee must review.  In fact, the SF Handbook requires mortgagees to review loss mitigation requests from borrowers in default each and every month a borrower remains in default.  Specifically, the SF Handbook provides, in relevant part:

vi.  Monthly Review

(A) Standard

The Mortgagee must evaluate on a monthly basis all Loss Mitigation Options available for Borrowers in Default as long as the Mortgage remains Delinquent.

(B) Required Documentation

The Mortgagee's servicing records must include monthly notations, documenting the Mortgagee's analysis and determination with respect to the appropriateness of each Loss Mitigation Option. If the Borrower indicates that there has been no change in their circumstances, the Mortgagee may note this in its records.

As long as the Borrower is performing on an approved Loss Mitigation Option, including Trial Payment Plans, the Mortgagee has met the monthly review requirement and must note this in the Claim Review File.

SF Handbook 4000.1 at III.A.2.i.ix, Revision No. 032719, March 27, 2019.[3]

---

[2] The SF Handbook has contained this same provision throughout all iterations dating back to its March 14, 2016 effective date.

[3] The SF Handbook has contained this same provision throughout all iterations dating back to its March 14, 2016 effective date, and which was previously identified as SF Handbook 4000.1 at III.A.2.i.vi.

13.    Simply put, until a borrower accepts a particular loss mitigation option available to the borrower, neither the SF Handbook nor any other regulation issued by the Secretary allows a mortgagee to limit how many times that borrower's account can be reviewed for eligibility for loss mitigation options.

14.    Moreover, neither the SF Handbook nor any other regulation issued by the Secretary imposes a limit or cap on the number of loss mitigation plans a borrower may qualify for or obtain.  In other words, if a borrower cures the default on the terms of the mortgage after accepting a loss mitigation option, but then defaults again, a mortgagee still must evaluate that borrower for loss mitigation options, and offer one to the borrower, if the borrower qualifies for it.

15.    The only limitation on the foregoing requirement applies when a borrower is offered and accepts a loan modification under the FHA's Home Affordable Modification Program ("HAMP")—a type of loss mitigation option.  A borrower can only obtain one FHA-HAMP loan modification within a 24-month period.  In particular, the SF Handbook states, in relevant part:

> (2) Borrower Qualifications
>
> The Mortgagee must ensure that the Borrower meets the following eligibility criteria for the FHA-HAMP Option:
> - The Borrower has recently experienced a verified loss of income or increase in living expenses and all Borrowers on the Note have signed and submitted hardship affidavits attesting to and describing the hardship.
> - One or more Borrowers receives Continuous Income.
> - The Mortgagee's calculations show that the resulting monthly Mortgage Payment not exceeding 40 percent of the Borrower's gross monthly income can be offered, provided that either:
>   - the Borrower(s) front-end ratio is greater than 31 percent; or
>   - 85 percent of the Borrower's surplus income is insufficient to cure arrears within six months.

- The Borrower has successfully completed a TPP based on the FHA-HAMP monthly Mortgage Payment amount.
- The Borrower has not executed an FHA-HAMP agreement in the past 24 months, unless the FHA-HAMP agreement was executed as part of a Disaster Loss Mitigation made available to the Borrower in a Presidentially-Declared Major Disaster Area (PDMDA).

SF Handbook 4000.1 at III.A.2.k.v(B)(2), January 2, 2020.[4]

16.     In sum, the foregoing provisions of the SF Handbook require a mortgagee (and any mortgage servicer acting on behalf that mortgagee) to continually evaluate a borrower in default on the terms of the mortgage for any and all loss mitigation options that may be available to the borrower if (1) the borrower has not been previously accepted a loss mitigation option, or (2) 24 months has passed since the borrower executed an FHA-HAMP loan modification.

17.     As noted above, these provisions of the SF Handbook are incorporated into the terms of all FHA-insured mortgage loans for single family homes—such as Plaintiff's Mortgage. Therefore, a mortgagee and mortgagee servicer's failure to comply with the SF Handbook is a breach of the terms of those security instruments.

## STATEMENT OF FACTS

18.     Plaintiff and each member of the Class (defined below) executed and were subject to the provisions of an FHA-insured mortgage loan for a single family home (collectively, the "Loans").

---

[4] The SF Handbook has contained a substantially similar provision requiring that a borrower has not executed a loan modification or FHA-HAMP agreement in the past twenty-four (24) months, dating back to its June 30, 2016 effective date. *See* SF Handbook 4000.1 at III.A.2.k.v(B)(2), Rev. No 063016, June 30, 2016.

19.     At all times relevant, Wells Fargo was the mortgagee and servicer of Plaintiff's and Class members' Loans.

20.     During the time period relevant to this action, Plaintiff and each Class member defaulted on their Loans.

21.     After defaulting on their Loans, Plaintiff and Class members submitted complete loss mitigation applications ("First Applications") to Wells Fargo.

22.     After submitting their First Applications to Wells Fargo, some Class members were deemed ineligible for all available loss mitigation options for which they applied, and therefore, their First Applications were denied.  Thereafter, each of these Class members submitted a second loss mitigation application (collectively, the "Second Applications") to Wells Fargo.

23.     After submitting their First Applications to Wells Fargo, Plaintiff, as well as certain other Class members, were offered and accepted loss mitigation options, such as an FHA-HAMP loan modification (collectively, the "Initial Loss Mitigation Plans"), but later defaulted on the terms thereof.  At least 24 months after they entered into their Initial Loss Mitigation Plans, and while they were still in default on the terms thereof, Plaintiff and each of these Class members submitted Second Applications to Wells Fargo.

24.     Therefore, Wells Fargo had an obligation to review Plaintiff's and each Class member's Second Application, pursuant to the rules and regulations promulgated by the Secretary and HUD which were incorporated into the terms of their Loans.

25.     However, instead of reviewing Plaintiff's and Class members' Second Applications for eligibility for any and all available loss mitigation options (and advise Plaintiff and Class members of its determination as to same), Wells Fargo refused to review each of the Second Applications and provided Plaintiff and each Class member with correspondence stating that "your

account is not eligible to be reviewed for assistance" (the "Refusal Notices"). *See*, a copy of a Refusal Notice dated September 20, 2019 sent to Plaintiff ("Plaintiff's Refusal Notice"), attached as Exhibit 4.

26.     Wells Fargo's actions in sending each of the Refusal Notices was in violation of the HUD requirement to review and evaluate each and every complete loss mitigation application submitted by Plaintiff and each Class member or to otherwise evaluate Plaintiff and each Class member monthly for all loss mitigation options available during the duration of their delinquency. *See*, SF Handbook 4000.1 at III.A.2.i.ii, Revision No. 032719, March 27, 2019; SF Handbook 4000.1 at III.A.2.i.ix, Revision No. 032719, March 27, 2019.

27.     Wells Fargo's actions in violation of the HUD requirement to review and evaluate each and every complete loss mitigation application submitted by Plaintiff and each Class member or to otherwise evaluate Plaintiff and each Class member monthly for all loss mitigation options available during the duration of their delinquency constitutes a breach of each of Plaintiff's and Class members' Loans.

28.     Plaintiff and Class members were harmed by Well Fargo's breach of the terms of their Loans in several different ways, as set forth below.

29.     As a result of Wells Fargo's breach, Plaintiff and Class members' attempts to obtain a review of their eligibility for all available loss mitigation options were delayed, causing Plaintiff and Class members who would have been eligible for a loss mitigation option to unnecessarily remain in a delinquent state on their Loans.  During that time, Plaintiff and Class members incurred pecuniary damages including:

a. Further fees and costs related to delinquent and default servicing for which Plaintiff and Class members became obligated, either directly and/or through such amounts being capitalized into a subsequent modification;

b. Further time, costs, and legal fees to defend against foreclosure proceedings against their homes; and

c. Further time, costs, and legal fees to submit subsequent loss mitigation applications which would not have been necessary but for Wells Fargo's actions in refusing to review their applications resulting in the Refusal Notices.

30.     The delay caused by Wells Fargo's breach also impeded and delayed Plaintiff's and Class members' ability to rehabilitate their consumer credit.  As a result of the ongoing harm to their consumer credit, Plaintiff and Class members chose to forgo seeking credit from other lenders (*e.g.*, chose not to apply for credit cards, chose not to obtain student loans, etc.), or obtained credit from other lenders on terms that were materially less favorable than they would have been offered but for the delay caused by Wells Fargo's breach.

31.     Some Class members relied upon Wells Fargo's incorrect assertion in the Refusal Notices that they were ineligible to be considered for certain loss mitigation options, and therefore refrained from seeking further review of loss mitigation options to which they were legally entitled. As a result, these Class members were unable to avail themselves of loss mitigation options that they should have obtained, or, if they ultimately were offered some type of loss mitigation option, that offer was on substantially less favorable terms than they would have obtained had Wells Fargo performed its legal obligations.

32.     Finally, Plaintiff and some Class members—*i.e.*, members of the Subclass (defined below)—sent Wells Fargo "notices of error" ("NOEs"), pursuant to 12 C.F.R. § 1024.35(a) and

12 U.S.C. § 2605(E)(1)(B) and "requests for information" ("RFIs"), pursuant to 12 C.F.R. § 1024.36(a), regarding Wells Fargo's improper refusal to review their Second Applications and its incorrect assertions in the Refusal Notices.

33.      Had Wells Fargo complied with its legal obligations under Plaintiff's and Subclass members' Loans, Plaintiff and Subclass members would not have been required to send these NOEs and RFIs to Wells Fargo.

34.      Therefore, as a result of Wells Fargo's conduct described here, Plaintiff and Subclass members incurred additional damages in the form of expenses associated with sending NOEs and RFIs—such as their time, postage, attorneys' fees, etc.—that would not have been necessary but for Wells Fargo's actions.

## **PLAINTIFF'S LOSS MITIGATION APPLICATIONS**

35.      At all times relevant, Plaintiff's Mortgage was an FHA-insured mortgage loan for a single family home.

36.      At some point after January 14, 2014, Plaintiff defaulted on the terms of her Mortgage.

37.      As a result of Plaintiff's default on the terms of her Mortgage, Plaintiff submitted a First Application to Wells Fargo seeking to be evaluated for, and enter into, an Initial Loss Mitigation Plan.

38.      On September 1, 2017, Plaintiff entered into an Initial Loss Mitigation Plan with Wells Fargo.  Plaintiff's Initial Loss Mitigation Plan was an FHA-HAMP loan modification ("Plaintiff's First Loan Modification"). *See*, Plaintiff's First Loan Modification, attached as Exhibit 2.

39.     At some point between September 1, 2017 and April 19, 2019, Plaintiff defaulted on the terms of her First Loan Modification.

40.     On April 19, 2019, Wells Fargo initiated foreclosure proceedings against Plaintiff in the Court of Common Pleas in and for Cuyahoga County, Ohio, Case No. CV-19-914470 (the "Foreclosure").

41.     On or about September 16, 2019, Plaintiff submitted a Second Application to Wells Fargo through email correspondence to Wells Fargo's foreclosure counsel, Lerner Sampson & Rothfuss ("Plaintiff's Second Application") along with a cover letter explicitly stating that twenty-four (24) months "have lapsed since [Plaintiff] executed [her  First Loan Modification] therefore [Plaintiff] should now be eligible to be considered for [another] modification under FHA HAMP". *See*, cover letter to Plaintiff's Second Application, dated September 16, 2019, attached as Exhibit 3.

42.     In response to Plaintiff's Second Application, Wells Fargo sent correspondence dated September 20, 2019 stating "[w]e're letting you know that we've determined that your account is not eligible to be reviewed for assistance" ("Plaintiff's Refusal Notice"). *See*, a copy of Plaintiff's Refusal Notice, attached as Exhibit 4.

43.     On or about October 8, 2019, Plaintiff, through counsel, sent correspondence to Wells Fargo at the address Wells Fargo designated for the receipt of requests for information pursuant to 12 C.F.R. § 1024.36(b) and notices of error pursuant to 12 C.F.R. § 1024.35(c) (the "Designated Address") via Certified U.S. Mail, Tracking No. 70142120000306721684, captioned "Notice of Error pursuant to 12 C.F.R. § 1024.35(b)(11) for failure to provide accurate information to a borrower regarding loss mitigation options and foreclosure, as required by 12 C.F.R. § 1024.38(b); Requests for Information Pursuant to 12 C.F.R. § 1024.36; and Formal Request to

Escalate Case pursuant to 4000.1, Section III (A)(2)(i)(xi)" ("NOE #1/RFI #1"). *See*, a copy of NOE #1/RFI #1, without enclosures, attached as Exhibit 5.

44.     Wells Fargo received NOE #1/RFI #1 at the Designated Address on October 11, 2019. *See*, a copy of the tracking information for NOE #1/RFI #1, attached as Exhibit 6.

45.     Through NOE #1/RFI #1, Plaintiff alleged that Wells Fargo committed an error in relation to Plaintiff's Loan by sending Plaintiff's Refusal Notice and wrongfully claiming therein that Plaintiff's Loan was "not eligible to be reviewed for assistance." *See*, Exhibits 4 and 5.

46.     Through NOE #1/RFI #1, Plaintiff requested that Wells Fargo provide information related to Plaintiff's Mortgage, including the document(s) Wells Fargo relied upon in determining that Plaintiff's Mortgage was not eligible to be reviewed for loss mitigation assistance as claimed in Plaintiff's Refusal Notice. *See*, Exhibits 4 and 5.

47.      Wells Fargo sent correspondence dated October 31, 2019 to Plaintiff in response to NOE #1/RFI #1 ("Response to NOE #1/RFI #1"). *See*, Response to NOE #1/RFI #1, without enclosures, attached as Exhibit 7.

48.     Wells Fargo stated in its Response to NOE #1/RFI #1 that Plaintiff's Mortgage "account was handled properly and no corrections are needed as no error has occurred," and merely referenced and enclosed a copy of Plaintiff's Refusal Notice. *See*, Exhibit 7.

49.     Wells Fargo also stated in its Response to NOE #1/RFI #1 that the documents Plaintiff requested in NOE #1/RFI #1 would not be provided as they are "considered to be privileged, confidential and/or proprietary information of Wells Fargo." *See*, Exhibit 7.

50.     On or about November 14, 2019, Plaintiff, through counsel, sent correspondence to Wells Fargo at the Designated Address via Certified U.S. Mail, Tracking No. 70142120000306721721, captioned "Notice of Error under 12 C.F.R. § 1024.35(b)(11) for failing

to properly investigate and respond to a borrower's Notice of Error pursuant to 12 C.F.R. § 1024.35(e); Requests for copies of documentation pursuant to 12 C.F.R. § 1024.35(e)(4); Notice of error pursuant to 12 C.F.R. § 1024.35(b)(11) for failure to properly respond to a request for information in compliance with 12 C.F.R. § 1024.36" ("NOE #2"). *See*, a copy of NOE #2, without enclosures, attached as <u>Exhibit 8</u>.

51.     Wells Fargo received NOE #2 at the Designated Address on November 21, 2019. *See*, a copy of the tracking information for NOE #2, attached as <u>Exhibit 9</u>.

52.     Through NOE #2, Plaintiff alleged that Wells Fargo committed errors in relation to Plaintiff's loan by (1) failing to perform a reasonable investigation into the error alleged in NOE #1/RFI #1, and (2) failing to properly respond to the requests for information contained in NOE #1/RFI #1 through its Response to NOE #1/RFI #1. *See*, <u>Exhibits 5, 7, and 8</u>.

53.     Plaintiff did not receive a substantive response to NOE #2.

54.     Plaintiff submitted another loss mitigation application to Wells Fargo on or about November 27, 2019 ("Plaintiff's Third Application").

55.     Wells Fargo sent correspondence to Plaintiff dated December 12, 2019 acknowledging receipt of Plaintiff's Third Application and that Plaintiff's Third Application was complete. *See*, a copy of Wells Fargo's acknowledgement of Plaintiff's Third Application, attached as <u>Exhibit 10</u>.

56.     Wells Fargo sent correspondence to Plaintiff dated December 17, 2019 stating that Plaintiff was approved for a second FHA-HAMP loan modification and outlining the terms of a trial payment plan for the same (the "TPP"). *See*, correspondence from Wells Fargo to Plaintiff, dated December 17, 2019, and the TPP enclosed therewith, attached as <u>Exhibit 11</u>.

57.     Plaintiff timely and properly accepted the TPP and made any and all payment due and owing under same.

58.     On April 25, 2020, Wells Fargo sent a copy of a permanent FHA-HAMP loan modification for Plaintiff's Mortgage to Plaintiff ("Plaintiff's Second Loan Modification"). Plaintiff executed Plaintiff's Second Loan Modification on May 5, 2020. *See*, Plaintiff's Second Loan Modification and accompanying correspondence, attached as Exhibit 12.

59.     Although Plaintiff ultimately received Plaintiff's Second Loan Modification (in response to Plaintiff's Third Application), Plaintiff was harmed by Wells Fargo's failure to review Plaintiff's Second Application, as required by the rules and regulations promulgated by the Secretary and HUD.  In particular, Wells Fargo's refusal to review Plaintiff's Second Application caused Plaintiff (1) to remain in a delinquent status on her Mortgage for a longer period of time than she would have otherwise; (2) to suffer continued damage to her credit standing and a delay in the rehabilitation of the same; (3) to incur legal fees and costs in defense of the Foreclosure, which would have been dismissed much earlier had Wells Fargo properly reviewed Plaintiff's Second Application; (4) to have additional amounts including interest, fees, costs, and corporate advances—which were incurred during the period between when Plaintiff submitted Plaintiff's Second Application and when Plaintiff submitted Plaintiff's Third Application—capitalized to the modified principal balance of Plaintiff's Mortgage.

60.     Plaintiff was also harmed by Wells Fargo's actions in refusing to properly handle and review Plaintiff's Second Application because it necessitated the submission of NOE #1/RFI #1 to Wells Fargo.  Had Wells Fargo properly reviewed Plaintiff's Second Application, Plaintiff would not have been required to submit NOE #1/RFI #1 regarding Wells Fargo's failure to do so. Accordingly, Wells Fargo's actions caused Plaintiff to incur costs associated with the preparation

and sending of NOE #1/RFI #1 to Wells Fargo—*e.g.*, legal fees, postage fees, time, etc.—that she would not otherwise have incurred.  Plaintiff also incurred similar costs related to her receipt and review of Wells Fargo's Response to NOE #1/RFI #1.

61.      Moreover, because Wells Fargo failed to property investigate and respond to the contentions and requests asserted in NOE #1/RFI #1, Plaintiff was required to submit NOE #2 to Wells Fargo.  Accordingly, Wells Fargo's actions caused Plaintiff to incur costs associated with the preparation and sending of NOE #2 to Wells Fargo—*e.g.*, legal fees, postage fees, time, etc.—that she would not otherwise have incurred.

## CLASS ACTION ALLEGATIONS

62.      **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a class of similarly situated individuals and entities (the "Class"), defined as follows:

> All loan borrowers in the United States, during the applicable statute of limitations, (1) who were obligated as a borrower under a mortgage loan insured by the FHA, (2) for which Wells Fargo was the mortgagee or otherwise acted on behalf of the mortgagee as the mortgage loan servicer, (3) who, in default on their obligations under such mortgage loan, submitted a complete loss mitigation application to Wells Fargo, and (4) who Wells Fargo refused to evaluate for a loss mitigation option, on the grounds that they were not eligible to be reviewed for loss mitigation assistance.

> Excluded from the Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

63.      **Subclass Definition**: In addition, Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a class of similarly situated individuals and entities (the "Subclass"), defined as follows:

All loan borrowers in the United States, during the applicable statute of limitations, (1) who were obligated as a borrower under a mortgage loan insured by the FHA, (2) for which Wells Fargo was the mortgagee or otherwise acted on behalf of the mortgagee as the mortgage loan servicer, (3) who, in default on their obligations under such mortgage loan, submitted a complete loss mitigation application to Wells Fargo, (4) who Wells Fargo refused to evaluate for a loss mitigation option, on the grounds that they were not eligible to be reviewed for loss mitigation assistance, and (5) who subsequently sent Wells Fargo a Notice of Error and/or Request for Information related to Wells Fargo's refusal to review their request for loss mitigation assistance.

Excluded from the Subclass are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Subclass; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

64.     **Numerosity and Ascertainability**: Upon information and belief, the Class and Subclass (together, the "Classes") are each composed of more than forty (40) members, such that the Classes are so numerous that joinder of all members is impractical. This conclusion is reasonable since as of the Second Quarter of 2017, Wells Fargo was the largest mortgage servicer in the country servicing approximately $1.532 trillion worth of mortgages, consisting of $343 billion of its own mortgages and $1.189 trillion of third-party mortgages, which amounted to roughly sixteen percent (16%) of all outstanding mortgage debt at the time.[5] While the exact number of members in the Classes is presently unknown and can only be ascertained through discovery, Class members can easily be identified through Defendant's records, the records of the FHA, or by other means.

---

[5] *Wells Fargo's Mortgage Servicing Portfolio To Grow Thanks To Deal With Seneca*, September 7, 2017, https://www.forbes.com/sites/greatspeculations/2017/09/08/wells-fargos-mortgage-servicing-portfolio-to-grow-thanks-to-deal-with-seneca.

65.    **Commonality and Predominance:** There are questions of law and fact common to the proposed Classes that predominate over any individual questions. As a result of Defendant's conduct described herein, Wells Fargo unjustly rebuffed Plaintiff's and Class members' attempts to be reviewed for eligibility for any and all loss mitigation options and were harmed as a result.

66.    **Typicality**: Plaintiff's claims are typical of the claims of the Classes. On information and belief, Plaintiff's and Class members' Loans contain substantially similar and uniform language in their incorporation of the regulations of the HUD Secretary, as they were drafted using standardized templates common to all loans insured by the FHA. As such, Plaintiff and all members of the Classes were subjected to and affected by a uniform course of conduct; specifically, Wells Fargo refusing to review loss mitigation applications submitted by Plaintiff and Class members for their eligibility for any and all loss mitigation options.

67.    **Adequacy**: Plaintiff will adequately represent the interests of the Classes and does not have adverse interests to the Classes. Plaintiff's counsel has extensive experience litigating consumer class actions.

68.    **Superiority**: A class action is the superior method for the quick and efficient adjudication of this controversy. If individual Class members prosecuted separate actions, it may create a risk of inconsistent or varying judgments that would establish incompatible standards of conduct.

<u>**CAUSES OF ACTION**</u>

**COUNT ONE:**
**BREACH OF CONTRACT**
**(On behalf of Plaintiff and the Class)**

69.    Plaintiff repeats and realleges paragraphs 1 through 68 with the same force and effect as though fully set forth herein.

70.     Each of the mortgage instruments executed by Plaintiff and Class members is an enforceable agreement between each such individual and Wells Fargo.

71.     Wells Fargo breached each of the mortgage instruments by failing to comply with the regulations of the HUD Secretary incorporated into each such instrument.

72.     Specifically, Wells Fargo breached Plaintiff's and each Class member's Loan by sending the Refusal Notices in violation the HUD requirement to review and evaluate each and every complete loss mitigation application submitted by Plaintiff and each Class member, or to otherwise evaluate Plaintiff and each Class member monthly for all loss mitigation options available during the duration of their delinquency. *See*, SF Handbook 4000.1 at III.A.2.i.ii, Revision No. 032719, March 27, 2019; SF Handbook 4000.1 at III.A.2.i.ix, Revision No. 032719, March 27, 2019.

73.     As a result of Wells Fargo's actions, Wells Fargo is liable to Plaintiff and Class members for actual damages as further described, *supra*.

**COUNT TWO:**
**VIOLATIONS OF 12 C.F.R. § 1024.35(e), 12 C.F.R. § 1024.36(d),**
**12 U.S.C. § 2605(e), AND 12 U.S.C. § 2605(k)**
**(Failure to timely and properly respond to RFIs and NOEs)**
**(On behalf of Plaintiff and the Subclass)**

74.     Plaintiff repeats and realleges paragraphs 1 through 68 with the same force and effect as though fully set forth herein.

75.     Pursuant to 12 C.F.R. § 1024.36, a servicer must respond to an RFI by:

(i)     Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or

(ii)    Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer,

provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.36(d)(1)(i)–(ii).

76.     Furthermore, a servicer must properly respond to an RFI within the following

deadlines:

A servicer must comply with the requirements of paragraph (d)(1) of this section:

(A)     Not later than 10 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives an information request for the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan; and

(B)     For all other requests for information, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the information request.

12 C.F.R. § 1024.36(d)(2)(i)(A)–(B).

77.     Similarly, pursuant to 12 C.F.R. § 1024.35, a servicer must respond to an NOE by

either:

(A)     Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

(B)     Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e)(1)(i)(A)–(B); *see also* 12 U.S.C. § 2605(e)(2)(B).

78.     A servicer must respond to an NOE in compliance the following deadlines:

(B)     Prior to the date of a foreclosure sale or within 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the notice of error, whichever is earlier, for errors asserted under paragraphs (b)(9) and (10) of this section.

(C)     For all other asserted errors, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the applicable notice of error.

12 C.F.R. § 1024.35(e)(3)(i)(B)–(C); *see also* 12 U.S.C. § 2605(e)(2).

79.     Plaintiff's and Subclass members' Loans are "federally related mortgage loans" as said term is defined by 12 C.F.R. § 1024.2(b).

80.     Plaintiff and Subclass members each submitted RFIs and/or NOEs to Wells Fargo in relation to the Loans. *See*, Exhibits 5 and 8.

81.     In the RFIs and NOEs Plaintiff and Subclass members submitted to Wells Fargo, Plaintiff and Subclass members alleged that Wells Fargo committed an error in relation to, and/or requested information regarding, Wells Fargo's claim that their mortgage loan accounts were "not eligible to be reviewed for assistance," and Wells Fargo's refusal to review their Second Applications for loss mitigation options. *See*, Exhibits 5 and 8.

82.     Since Wells Fargo was legally and contractually obligated to review Plaintiff's and Subclass members' Second Applications, Wells Fargo would have uncovered such an error (and the reasons for that error) had it performed a reasonable investigation into Plaintiff's and Subclass members' RFIs/NOEs.

83.     Yet, in response to each of Plaintiff's and Subclass members' RFIs/NOEs, Wells Fargo claimed that it had not committed an error relative to its failure to review Plaintiff's and

Subclass members' Second Applications, and refused to provide any information regarding its decision to do so.

84.     Accordingly, Wells Fargo failed to perform a reasonable investigation into the errors asserted in Plaintiff's and Subclass members' NOEs, and failed to adequately respond to Plaintiff's and Subclass members' RFIs.

85.     Wells Fargo's failure to perform a reasonable investigation into and otherwise properly respond to Plaintiff's and Subclass members' RFIs and NOEs constitutes a violation of 12 C.F.R. § 1024.35(e) and 12 U.S.C. §§ 2605(e) and (k) and, as a result, Plaintiff and the other Subclass members suffered actual damages, further described, *supra*.

86.     Wells Fargo's actions are part of a pattern and practice of behavior in disregard of Plaintiff's and the other Subclass members' rights.

87.     As a result of Wells Fargo's actions, Wells Fargo is liable to Plaintiff and the Subclass members for statutory damages and actual damages. 12 U.S.C. § 2605(f)(1).

88.     Additionally, Plaintiff, individually and on behalf of all others similarly situated, requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Amy S. Tanner, individually and on behalf of the Classes, prays for an order as follows:

A.     Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Classes defined herein;

B.     Designating Plaintiff as representative of the Classes and her undersigned counsel as Class Counsel;

C.     Entering judgment in favor of Plaintiff and the Classes, and against Defendant;

D.      Awarding Plaintiff and the Classes their actual damages, statutory damages, and punitive damages, as allowed for or required by law;

E.      Awarding Plaintiff and the Classes reasonable attorneys' fees and costs; and

F.      Granting all such further and other relief as this Court deems just and appropriate.

Respectfully submitted,

*/s/ Marc E. Dann*

Marc E. Dann (Ohio Bar No. 0039425)
mdann@dannlaw.com
Whitney P. Horton (Ohio Bar No. 098224)
whorton@dannlaw.com
Daniel M. Solar (Ohio Bar No. 0085632)
dsolar@dannlaw.com
Brian D. Flick (Ohio Bar No. 0081605)
bflick@dannlaw.com
Dann Law
P.O. Box 6031040
Cleveland, OH 44103
Phone: (216) 373-0539
Fax: (216) 373-0536
notices@dannlaw.com

Thomas A. Zimmerman, Jr. (*pro hac vice* anticipated)
tom@attorneyzim.com
Matthew C. De Re (*pro hac vice* anticipated)
matt@attorneyzim.com
Zimmerman Law Offices, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Phone: (312) 440-0020
Fax: (312) 440-4180

*Counsel for Plaintiff and the putative Classes*

## **JURY DEMAND**

Plaintiff Amy Tanner hereby requests a trial by jury on all issues so triable.

<div style="margin-left: 40%">

*/s/ Marc E. Dann*
Marc E. Dann (Ohio Bar No. 0039425)
Whitney P. Horton (Ohio Bar No. 098224)
Daniel M. Solar (Ohio Bar No. 0085632)
Brian D. Flick (Ohio Bar No. 0081605)
Dann Law

*Counsel for Plaintiff and the putative Classes*

</div>